MILTON PINNICK vs. CARL CLEARY.

Suffolk. May 6, 1971. — June 29, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, REARDON, QUIRICO, & BRAUCHER, JJ.

*Insurance*, Motor vehicle personal injury protection benefits ("no-fault" insurance). *Constitutional Law*, Due process of law, Equal protection of laws, Police power, Alteration of cause of action, Alteration of common law rights, Motor vehicle personal injury protection benefits ("no-fault" insurance). *Statute*, Mutability.

St. 1970, c. 670, which in summary provides prospectively, with some exceptions, for payment by the insurer under a policy of compulsory motor vehicle liability insurance to the insured and certain other persons, up to $2,000, of medical and certain other expenses and 75% of lost wages incurred through personal injuries sustained in a motor vehicle accident involving the insured vehicle, irrespective of fault in the causation of the accident, and which preserves to such an injured person his common law right of action against an alleged tortfeasor for any elements of damage other than those so payable by the insurer, except that his right of recovery for pain and suffering is limited to instances where his medical expenses exceed $500 or where any of five specified types of injury is or are involved, does not violate Part II, c. 6, art. 6, of the Massachusetts Constitution or art. 11 of the Declaration of Rights or any right protected by the first ten amendments of the Federal Constitution in altering the injured person's common law rights [10–14]; the statute bears a rational relation to a legitimate legislative objective in dealing with problems arising from motor tort litigation, provides a reasonable substitution for prior rights,

1

and does not, either as a whole or in specific provisions, violate the due process clause of the Federal Constitution [14–27]; the classification in the statute with respect to recovery for pain and suffering bears a rational relationship to a proper legislative objective and is not violative of the equal protection of laws clause of the Federal Constitution [27–31]; the statute does not violate Part II.c. 1, § 1, art. 4, of the Massachusetts Constitution, or arts. 11, 15, 30, of the Declaration of Rights [31]; and the statute was constitutional under both the Federal and Massachusetts Constitutions as applied to a motor vehicle operator injured in an accident caused exclusively by negligence of another operator [31–32]; TAURO, C.J., concurring in the result on the ground of the presumption of constitutional validity of the statute and failure of the injured person to sustain the burden of proving its unconstitutionality [32–33, 41].

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on January 8, 1971.

The suit was reserved and reported by *Reardon, J.*

*Frederick S. Pillsbury (Alexander J. Cella & Robert Cohen* with him) for the plaintiff.

*Herbert P. Wilkins (Donald H. Carvin, Jeffrey Swope & Acheson H. Callaghan, Jr.,* with him) for the defendant.

*Walter H. Mayo, III,* Assistant Attorney General *(James P. Kiernan,* Assistant Attorney General, with him) for the Attorney General.

*John G. Ryan* for The Massachusetts Association of Independent Insurance Agents & Brokers, Inc.; *Richard K. Donahue & Richard N. Pearson* for Massachusetts Bar Association; *Richard M. Markus* of Ohio, *& William Schwartz* for American Trial Lawyers Association; *Paul A. Tamburello* for American Trial Lawyers Association Massachusetts Chapter, Inc.; and *Archibald Cox & Philip B. Heymann* for American Mutual Insurance Alliance and American Insurance Association, amici curiae, submitted briefs.

REARDON, J. This bill for declaratory relief comes to us on a reservation and report from the single justice. It presents a multifaceted attack on the constitutionality of St. 1970, c. 670, which amends in part chapters 90, 175, and 231 of the General Laws, and which establishes a modified system of compensation through their own insurers for vic-

tims of automobile accidents regardless of fault.[1] The plaintiff has raised and argued a number of issues which are not presented by what appears in the record. We realize that where questions of pressing public importance are involved we may in our discretion express our opinion on matters fully argued even though they are not essential to disposition of the exact controversy before the court. *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 697. However, such issues raised here by the plaintiff call for interpretation of terms and provisions of c. 670 which are not self-explanatory and which are not called into question at all by the record. It is inevitable that this first legislative attempt at a fundamental alteration and modernization of an important segment of the common law of torts will generate many problems arising out of such provisions. We cannot deal with these problems in the abstract and refrain therefore from dealing with c. 670 in its effects beyond the set of facts before us.

## THE FACTS.

The facts of the case are not disputed. The plaintiff, a resident of Massachusetts, is the owner of a motor vehicle duly registered under the laws of the Commonwealth and insured under a policy which includes personal injury protection benefits as defined in St. 1970, c. 670. The policy was not subject to the optional deductible endorsement (deductible) provided in c. 670. While he was driving his car on a public way in Boston early on the morning of January 3, 1971, two days after the effective date of that statute, he was involved in an accident which was caused exclusively by the negligence of the defendant. The car the defendant was driving was owned by one Daniel Mack, and

---

[1] The bill also questions the constitutionality of St. 1970, c. 744. Chapter 744 amends the provisions of c. 670 dealing with the renewal and cancellation of policies, and provides also for the contingency that parts of c. 670 might be held unconstitutional. It raises no separate issues. If c. 670 is held constitutional, a fortiori c. 744 will likewise be constitutional. We thus do not discuss it further.

was also covered by an insurance policy which included personal injury protection benefits as defined in c. 670.

As a result of the accident, the plaintiff suffered injuries which included a bone contusion of the left lower scapula, a contusion and sprain of lower scapula muscles on both sides, and a severe low back sprain with radiation of pain into the lower right extremity. He incurred $115 in reasonable and necessary medical expenses for treatment of these injuries. Although he had no medical insurance in his own name, he was covered by a policy issued to his wife which provided for reimbursement of his medical expenses over $100. The entire $115 would have been recoverable in a traditional common law tort action against the defendant, as well as $800 for his pain and suffering.

Due to the accident the plaintiff lost in addition seventy-three hours from his position with the United States Post Office. His salary in this position was $176.77 a week, a figure which also represents his average weekly wages for the year preceding the accident. He received his usual salary for the entire period of his absence, however, due to the paid sick leave and annual leave to which he was entitled. His accumulated paid sick leave of forty hours was exhausted in the process, and his paid annual leave was reduced by thirty-three hours.

The plaintiff also held a second job at the time of the accident which paid him at the rate of $96.25 a week. This amount was his average weekly wage for that job for the year preceding the accident. The accident caused him to miss twelve days from this work, for which he was not compensated. In a tort action at common law, on these facts the plaintiff could have recovered $650 from the defendant for loss of earning capacity. His total recovery in tort against the defendant, including general and special damages, would therefore have been $1,565 ($115 + $650 + $800).

The plaintiff made demand on the defendant for reasonable compensation in accordance with the recoverable elements of damage at common law as outlined above. The

defendant refused, raising as a defence c. 670 which, inter alia, exempts a tortfeasor from liability up to $2,000 to the extent the claimant is entitled to personal injury protection benefits from his own insurer.  The defendant also noted that in the circumstances of his case the plaintiff was not entitled to any damages for pain and suffering under c. 670, although he retained his right to sue in tort for other elements of damage not covered by the personal injury protection benefits.

The plaintiff in this bill claims that this operation of c. 670 deprives him unconstitutionally of his right to full recovery in tort.  He has supported this claim by an exceedingly prolix brief of 373 pages, the contentions of which are aided by amicus briefs filed with us by the American Trial Lawyers Association, the Massachusetts chapter of that organization, and the Massachusetts Bar Association.  Supporting the law we have, in addition to the defendant's brief, arguments in behalf of the constitutionality of c. 670 submitted by the American Mutual Insurance Alliance and American Insurance Association, the Massachusetts Association of Independent Insurance Agents and Brokers, Inc., and the Attorney General acting pursuant to G. L. c. 231A, § 8.

### SUMMARY OF CHAPTER 670.

The briefs before us, even those aligned on the same side of the case, reveal divergent views on how c. 670 operates. Accordingly, we believe it advisable to summarize the basic structure of the statute.  In so doing we will not attempt a comprehensive description of its scope and operation, for much of that, as we have indicated, is irrelevant for our present purposes.  We wish rather at this juncture to draw attention first to the difference in the legal position of the injured party under c. 670 from his position at common law, and, secondly, to the practical consequences of the statute on him, taking into consideration the interaction of various forms of compulsory and optional insurance with c. 670.

Those who challenge c. 670 have attributed to it not only

a drastic stripping of legal rights but also, in its practical effect, a substantial diminution of the damages which the average non-negligent accident victim may reasonably expect. Analysis demonstrates, on the contrary, that the Legislature has acted with extreme caution in altering prior legal rights, changing in only one respect the elements of damage which are recoverable by the victim. As to the practical effect of c. 670, it appears that the statute affords the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses and an increased flexibility in avoiding duplicate coverage, at double premiums, for the same expenses. In return for this he surrenders the possibly minimal damages for pain and suffering recoverable in cases not marked by serious economic loss or objective indicia of grave injury and the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he may be able to reap a monetary windfall out of his misfortune.[2]

The key concept embodied in c. 670 is that of personal injury protection insurance, which is required of all owners of motor vehicles registered in Massachusetts. Under this coverage, personal injury protection benefits are paid by the insurer, as the expenses they cover accrue, to the insured, members of his household, authorized operators or passengers of his motor vehicle including guest occupants, and any pedestrians struck by him, regardless of fault in the causation of the accident.[3] Limited in amount to $2,000, the benefits cover largely the same items of medical expense

---

[2] We note that the agreement of the parties in this case that the plaintiff would have recovered the sum of $800 for pain and suffering is at best an estimate and a questionable figure.

[3] There are only three exceptions to this no-fault rule. If the injured party otherwise entitled to benefits was injured while driving under the influence of alcohol or narcotics as defined in G. L. c. 94, § 197, while committing a felony or seeking to avoid arrest, or while intentionally trying to injure himself or others, he may be excluded from benefits by the insurer. In addition, one injured in circumstances which entitle him to workmen's compensation is not eligible for benefits.

covered before by optional medical payments insurance, with
the exception that expenses incurred within two years of the
accident are included as opposed to the one year period
generally covered in optional insurance. Personal injury
protection covers in addition, however, two other types of
out-of-pocket expenses. The first and less significant of
these is "payments in fact made to others, not members of
the injured person's household and reasonably incurred in
obtaining from those others ordinary and necessary services
in lieu of those that, had he not been injured, the injured
person would have performed not for income but for the
benefit of himself and/or members of his household." The
second is seventy-five per cent of the actual lost wages of
the injured party, calculated on the basis of his average
weekly wage during the year preceding the accident. If the
victim was unemployed, he is entitled to the same per-
centage of wages he can prove he would have received from
work he would have had had he not been injured.

Benefits allocable to medical expenses are paid regardless
of any other insurance covering the same costs. However,
to avoid duplicate recovery and reduce the expense of in-
surance, c. 670 provides the option to elect a deductible,
binding on the insured or on the members of the insured's
household. These policies, for a reduced premium, provide
that an amount from the first $250 up to the entire $2,000
otherwise recoverable as personal injury protection benefits
shall not be paid by the insurer.

Benefits allocable to lost wages, on the other hand, are
reduced by any amounts received under a wage continuation
plan or its equivalent. The victim, however, may incur
(within a year of the payment of the last benefit) a later
injury for which he would be entitled to payments under the
wage continuation plan. If the amount then available to
the victim to meet lost wages caused by the later injury has
been reduced by reason of the payments under the plan
attributable to the earlier accident then the insurer shall be
responsible to the extent of the reduction.

Thus under c. 670 the accident victim, with a few minor exceptions, is entitled to immediate payment of his most pressing items of cost: medical expenses. In addition, he receives the major portion of his lost wages not covered by a wage continuation plan, and certain consequential expenses. These amounts, to a total of $2,000, are due from his own insurer, not from an adversary insurance company, and without the necessity for assignment of fault or the temptation on either side to bargain in the light of considerations which are often extraneous to the amount of expense incurred.

In exchange for the protection extended by c. 670, the accident victim loses his right to recover in tort to the extent he is eligible for personal injury protection benefits. Because the exemption of the tortfeasor is exactly matched to the availability of personal injury protection benefits to the plaintiff, the plaintiff loses nothing by it.[4] With one restriction to be discussed below, the potential plaintiff retains in addition his common law action against the tortfeasor for any elements of damage not recovered as personal injury protection benefits. These would include any expenses in excess of $2,000 which would otherwise have been covered by personal injury protection and the difference between his diminished earning capacity, as measured at common law, and the substitute percentage of actual lost wages reduced by amounts received under any wage continuation plan recoverable under c. 670. Since the new law has retained the previous requirements of compulsory liability insurance under G. L. c. 90, § 34A, the victim who chooses to sue has the same assurance of at least limited recovery if he can prove negligence as he had before the passage of c. 670.

The plaintiff stresses that the residual tort action left after the payment of personal injury protection benefits is

---

[4] The sole exception is the accident victim who receives benefits in a reduced amount because he chose a deductible. The exemption of the tortfeasor includes the amount of benefits which the victim would have received but for the deductible.

reduced in value inasmuch as the potential plaintiff must consider the extent to which legal fees will reduce his net recovery. However, legal fees are not a new burden imposed by c. 670; they have long been a factor to be considered in prosecuting any claim, including a tort action for personal injury instituted before the passage of c. 670.

The only limitation imposed by c. 670 on the potential plaintiff's prior right of recovery at common law is the elimination of damages for "pain and suffering, including mental suffering associated with . . . injury" except in certain specified categories of cases. Section 5 of c. 670 provides generally that the reasonable and necessary medical expenses incurred by a plaintiff in the treatment of his injuries must be over $500 to permit recovery for pain and suffering. However, recognizing that certain types of injuries could entail considerable pain and suffering which would warrant monetary compensation regardless of medical expense incurred, the Legislature provided by way of exception to the general rule that damages for pain and suffering could be sought in all cases involving five designated types of injuries. These are a fracture, injury causing death, injury consisting in whole or in part of loss of a body member, permanent and serious disfigurement, and injury resulting in loss of sight or hearing as elsewhere defined in the General Laws. The victim whose injury falls outside these categories and whose medical expenses are less than $500 cannot recover at all for pain and suffering.[5] However, it is still possible for the person who desires to assure for himself recovery in excess of his out-of-pocket costs to do so. Just as he may elect a deductible if he has medical payments insurance to avoid duplicate recovery for medical expenses, so he may choose to keep both forms of insurance

---

[5] In the case at bar, the plaintiff cannot recover the $800 which was the agreed amount of damages allocable to his pain and suffering. However, as the above analysis shows, the rest of the $1,565 recoverable by him before at common law is still payable under c. 670. That part not covered by personal injury protection benefits, in this case attributable only to the difference between his diminished earning capacity and the amount recoverable for lost wages under c. 670, may be recovered by him in a tort action against the defendant, who is not immune from this liability.

in full precisely to allow himself double recovery of these expenses.[6]   Other forms of duplicate coverage are equally possible.   It is true that the amount of excess he will receive thereby will bear no necessary relation to the value of his pain and suffering as arbitrarily set by a jury but, on the other hand, he is assured of some profit over out-of-pocket expenses in every motor vehicle accident.   This certainty he was never afforded by his prior "right" to recovery for pain and suffering in a suitable case, which in order to be realized even in such a case had to be actively pursued at considerable expense.

The preceding discussion is not intended as a holding or ruling on any part of the statute, but only to permit a better understanding of that which follows.

## NATURE OF RIGHTS AFFECTED.

In approaching the numerous issues before us, it is advisable to dispose first of a contention which the plaintiff has argued vigorously and at some length, for if we accepted it, it would require a somewhat different approach to the attacks leveled at the statute than that we feel appropriate.   The plaintiff claims that c. 670 has impaired a cause of action which is on a higher, more sacrosanct level than the "ordinary" common law cause of action.   Two alternative reasons are advanced in support of this contention: first, that the tort action has the status of a "vested property right," and, second, that the function of the cause of action is to safeguard the fundamental "right of personal security and bodily integrity" which, although not mentioned in the Bill of Rights of the United States Constitution, is nonetheless protected by it.   We find both grounds unpersuasive.

In arguing that the cause of action affected by c. 670 constitutes a vested property right, the plaintiff seems to ignore the distinction between a cause of action which has accrued and the expectation which every citizen has if a

---

[6] We recognize that certain policies of insurance exclude the possibility of double recovery.

legal wrong should occur to find redress according to the
rules of statutory and common law applicable at that time.
The Legislature is admittedly restricted in the extent to
which it can retroactively affect common law rights of re-
dress which have already accrued.   However, there is au-
thority in abundance for the proposition that "[n]o person
has a vested interest in any rule of law entitling him to
insist that it shall remain unchanged for his benefit." *New
York Cent. R.R.* v. *White*, 243 U. S. 188, 198.  *Munn* v.
*Illinois*, 94 U. S. 113, 134.  And, as we shall demonstrate in
more detail below, legislative actions based on this principle,
prospectively modifying or abrogating common law causes
of action, have been judicially upheld both in this Common-
wealth and elsewhere on numerous occasions.   The citizen
may find that events occurring after passage of such a
statute place him in a different position legally from that
which he would have occupied had they occurred before
passage of the statute.   He has no cause, however, to com-
plain solely because his rights are not now what they would
have been before.

   The applicability of this principle to the rights affected
by c. 670 is not in any way changed by Part II, c. 6, art. 6,
of the Constitution of Massachusetts, or by art. 11 of its
Declaration of Rights, on both of which the plaintiff seems
to rely.   Article 6 provides for the continuation in the
Commonwealth of the great body of the common law as
amended by statute prior to the colonial immigration.  *Com-
monwealth* v. *Churchill*, 2 Met. 118, 123.  *Crocker* v. *Justices
of the Superior Court*, 208 Mass. 162, 171.   It explicitly
contemplates the ". . . [alteration] or . . . [repeal] by
the legislature" of such prior existing law, as indeed it
would have to in order to avoid freezing outmoded rules of
law into our jurisprudence by placing them beyond the
reach of the Legislature.   See *Holden* v. *Pioneer Bdcst. Co.*
228 Ore. 405, 411–412.

   Article 11 of the Declaration of Rights guarantees "a
certain remedy, by having recourse to the laws, for all in-
juries or wrongs which . . . [one] may receive . . . ."  The

article is clearly directed toward the preservation of procedural rights and has been so construed. See, e.g., *Cressey* v. *Erie R.R.* 278 Mass. 284, 291; *Universal Adjustment Corp.* v. *Midland Bank, Ltd.* 281 Mass. 303, 320; *Commonwealth* v. *Hanley*, 337 Mass. 384, 387. The only intimation which has been cited to us that it might have ramifications in the area of substantive rights is a dictum in *Commonwealth* v. *Boston Transcript Co.* 249 Mass. 477, 482, that the Legislature might be precluded under art. 11 from abolishing an action for libel in certain circumstances as it had purported to do.[7] However, changes in prior law are necessary in any ordered society, and to argue that art. 11 prohibits alterations of common law rights as such, especially in the face of the specific provision to the contrary in art. 6, flies in the face of all reason and precedent. To the extent that the dictum in the *Boston Transcript* case is to the contrary we decline to follow it.

We are baffled by the plaintiff's further attempt to find in c. 670, in so far as it affects the tort action for bodily injury, an impairment of some fundamental right protected by the first ten amendments to the Federal Constitution. The plaintiff lays emphasis on Mr. Justice Goldberg's concurring opinion in *Griswold* v. *Connecticut*, 381 U. S. 479, 486. In that case a Connecticut law banning the use of contraceptives was held to violate the right of privacy as contained in the first ten amendments. Any supposed analogy of the present case to the *Griswold* case is inapposite and does nothing to advance the plaintiff's argument. Whatever may be the fundamental "right of personal security and bodily integrity" to which the plaintiff refers, it is not affected by c. 670. That chapter merely limits the common law right in the automobile accident situation to obtain money damages on account of unintentionally inflicted pain

---

[7] We note that much the same effect has since been achieved as the result of recent constitutional limitations imposed on the law of libel. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254; *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29

and suffering and modifies the procedure for obtaining damages according to the common law measure for all other elements of recovery. See *Dandridge* v. *Williams*, 397 U. S. 471, 484.

We thus perceive no basis for treating a legislative alteration of the tort action for personal injuries differently from an alteration of any other preëxisting rule of the common law. Hence we may summarily dispose of several of the plaintiff's arguments which are founded on the contrary premise. There is no cause here for application of the "compelling state interest" test, which is employed where a statute impairs fundamental rights protected by the Constitution. Nor, for the same reason, can the statute be struck down on the ground that it sweeps unnecessarily broadly in the face of a less restrictive alternative which would achieve the same ends. See *National Assoc. for the Advancement of Colored People* v. *Alabama ex rel. Flowers*, 377 U. S. 288, 307–308; *Aptheker* v. *Secretary of State*, 378 U. S. 500, 514. With respect to this latter test, we have noted that it has been applied in the past not only to "constitutionally sheltered activity" but also to "regulations affecting interstate commerce . . . and economic regulations." *Commonwealth* v. *Leis*, 355 Mass. 189, 195–196. However, no argument has been presented to us to show that c. 670 either in purpose or effect is discriminatory against interstate commerce; therefore, the less restrictive alternative test is not applicable to it as a regulation affecting interstate commerce. *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354. Nor is c. 670 a total prohibition of a hitherto lawful economic activity of the sort to which the less restrictive alternative test has been applied in the economic sphere. *Weaver* v. *Palmer Bros. Co.* 270 U. S. 402, 414–415. Furthermore, even this limited use of the test in this context is doubtful in the light of subsequent decisions according wide discretion to the Legislature in setting social and economic regulations according to its perception of the public interest. *Olsen* v. *Nebraska ex rel. Western Reference & Bond Assn. Inc.* 313 U. S. 236, 246–247. *Staten Island Loaders* v. *Water-*

*front Commn. of New York Harbor,* 117 F. Supp. 308, 310–311 (S. D. N. Y.).

We conclude that the principles by which c. 670 should be judged are those generally applied when economic and social regulations enacted under the police power are attacked as a violation of due process and equal protection of the laws. The two grounds of attack although similar are sufficiently distinct to warrant separate treatment, to which we now proceed.

## DUE PROCESS ISSUES.

A. *Applicable Principles.* We will deal first with the propriety of c. 670 under the due process clause. The overall test under this clause is whether the statute bears a reasonable relation to a permissible legislative objective.[8] *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 283–284. *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 306. *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 391. In the application of this test, the statute is accorded a presumption of constitutionality (*Howes Bros. Co.* v. *Unemployment Compensation Commn., supra,* at 284; *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life, supra,* at 305; *Commonwealth* v. *Finnigan,* 326 Mass. 378, 379), a corollary of which is that if a state of facts could exist which would justify the legislation, it must be presumed to have existed when the statute was passed. *Munn* v. *Illinois,* 94 U. S. 113, 132. *United States* v. *Carolene Prods. Co.* 304 U. S. 144, 152-153. *McGowan* v. *Maryland,* 366 U. S. 420, 426–427.

In dealing with an alteration of the preëxisting common law, we are guided also by cases which have dealt specific-

---

[8] Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of its Declaration of Rights, are the provisions in our Constitution comparable to the due process clause of the Federal Constitution. They raise no distinct issues in dealing with this kind of statute and do not, therefore, warrant separate discussion. *Lowell Co-op. Bank* v. *Co-operative Cent. Bank,* 287 Mass. 338, 343–344. *Lowell Gas Co.* v. *Department of Pub. Util.* 324 Mass. 80, 87–88. Compare *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health,* 348 Mass. 414, 421.

ally with due process attacks on this kind of statute. Here we do not need to reach the difficult question of when the Legislature may abrogate a common law right of recovery without providing a substitute remedy. Such actions in other contexts have been sustained because it was felt that the Legislature was acting "to attain a permissible legislative object." *Silver* v. *Silver*, 280 U. S. 117, 122 ("guest statute," taking away right of gratuitous passenger in automobile to sue driver on account of mere negligence). *Hanfgarn* v. *Mark*, 274 N. Y. 22, appeal dismissed 302 U. S. 641 (abolition of actions for breach of promise, seduction, alienation of affections, and criminal conversation — no substantial Federal question presented on appeal to Supreme Court). We have never had the occasion to pass on comparable statutes enacted by our Legislature, although we have noted their existence and effect (*Thibault* v. *Lalumiere*, 318 Mass. 72, 75), and recognized generally the power of the Legislature to act in this regard. *Opinion of the Justices*, 309 Mass. 571, 598.

In the instant case, however, the Legislature has not attempted to abolish the preëxisting right of tort recovery and leave the automobile accident victim without redress. On the contrary, as was pointed out above, the statute has affected his substantive rights of recovery only in one respect and has simply altered his method of enforcing them in all others. Therefore, c. 670 may be judged by the stricter test which the plaintiff urges upon us and for which there is considerable authority in workmen's compensation cases: whether the statute provides an adequate and reasonable substitute for preëxisting rights. *New York Cent. R.R.* v. *White*, 243 U. S. 188, 201 (New York workmen's compensation statute). See *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, 240–241 (Washington workmen's compensation statute). The similarity between c. 670 and the workmen's compensation statutes, in the nature of their purposes and the means chosen to achieve them, also leads us to conclude that the reasonable and adequate substitute test is appropriate to apply here even if its application is not con-

stitutionally required.[9]   We will, therefore, consider c. 670
in the light of a twofold test: the general test required by
the due process clause of whether it bears a rational relation
to a legitimate legislative objective, and the more par-
ticularized test for which the plaintiff argues — whether it
provides a reasonable substitute for preëxisting rights.

B. *Does c. 670 bear a rational relation to a legitimate legis-
lative objective?*   The ills against which c. 670 is aimed are
obvious.   One of the most prominent of these will be found
in a brief consideration of the impact of the automobile on
the burden of litigation carried by courts in general and
Massachusetts courts in particular.   No one who has for
any time been in charge of a trial court system (as was the
author of this opinion for a number of years) can be un-
familiar with the devastating effect upon the administration
of justice which the automobile has produced.   For years,
in the face of countless experiments, the trial calendars of
this country, particularly in metropolitan areas, have become
increasingly clogged with motor vehicle tort litigation.   No
one as yet, notwithstanding heroic efforts in this regard,
has found a satisfactory method of disentangling this morass.
Indeed, the problem intensifies as American courts are in-
creasingly called upon to deal with complexities of our society
not evident when the motor vehicle first appeared on the
national scene and to broaden the scope of their activities
into areas not traditionally subject to judicial cognizance.
The courts with their scarce resource of time simply cannot
respond to new challenges or meet the new requirements
imposed on them in criminal matters as long as their time
continues to be consumed to the extent it has been by motor
vehicle accident cases.   The problems of society to which
the courts have been called no longer permit the luxury of
using them as a forum for resolving the ever increasing
numbers of automobile accident claims to the extent that
has obtained hitherto.

---

[9] The nature and direction of the opposition to c. 670 and similar acts in
other jurisdictions is highly reminiscent of that which attended passage of
the first workmen's compensation acts.   See Locke, Workmen's Compensa-
tion, Boston Law Book Co. (1968) §§ 22 et seq.

Pinnick *v.* Cleary.

These observations are nowhere more applicable than in Massachusetts. We have lived with compulsory liability insurance since January 1, 1927. In that period certain events have occurred which might well have commended themselves to the Legislature as indicia pointing toward the wisdom of change. Eleven years ago, for instance, a special commission found that on the basis of bodily injury claim frequency per one hundred cars insured, the average in Massachusetts in the years 1954–1956 was 6.4% as against 2% for Maine, 3.1% for Rhode Island, 2% for Vermont, and 3.3% for Connecticut. In 1959, the year the report was filed, the claim frequency in Boston on a local basis exceeded that in New York City by more than 50%.[10] The seriousness of the problem in so far as it relates to current Massachusetts civil trial dockets can be seen in the following figures related to the Superior Court.

| *Total law entries* of which there were | | *Total Motor Vehicle entries* |
|------|--------|---------------|
| 1967 | 34,730 | 23,279 |
| 1968 | 33,558 | 22,289 |
| 1969 | 34,381 | 22,598 |
| 1970 | 35,155 | 22,690 [11] |

When it is recognized that many of these automobile entries represent multiple party suits, the weight which this type of litigation places on Massachusetts courts is evident.

Less obvious is the burden on the clerks' offices, lawyers and litigants which follows this proliferation of entries of motor cases, currently at the rate of almost 2,000 a month in the Superior Court and more than 3,200 a month in the District Courts. Every paper submitted must be filed and docketed, and each entry prompts an avalanche of them. In addition to the writ, declaration, answer and appearance slips; interrogatories by parties on both sides, applications to nonsuit or default for failure to answer interrogatories, motions to extend time for answering or to remove nonsuit

---

[10] Report of Special Commission relative to the Motor Vehicle Laws and the Insurance Laws as they Relate to Motor Vehicles and Certain Related Matters, 1959 Senate Doc. No. 466.

[11] Figures compiled by the Executive Secretary of the Supreme Judicial Court.

or default for not answering interrogatories, motions to strike answers to interrogatories and to answer over or further, motions for specifications, and demands to admit facts are only a few of the papers that follow as of course in almost every motor tort case entered. Court personnel are additionally burdened by the need to give notice to counsel or parties of every order of the court entered during these lengthy pre-trial proceedings. The time of the court consumed in this preliminary war of nerves between counsel, or between claimant and insurer, is almost impossible to estimate, but probably far exceeds that spent in the trial of the small percentage of all entries which must be tried.

Both in the pre-trial and later stages, claims for small amounts possess, of course, the same capability of clogging the judicial system as their larger brothers. They must be dealt with either on the Superior Court level where they do not belong or in the District Courts, from which removal or retransfer to the Superior Court will often occur. And, unfortunately, it cannot be concluded that the bulk of automobile accident claims in the Superior Court represents causes of great value. For many years the secretary of the Judicial Council maintained a record of the amount of jury verdicts.[12] This tabular count was discontinued in 1956. In the year immediately prior to its discontinuance the following interesting statistics were compiled.

| Amount of Jury Verdict for Plaintiff | Percentage of Cases Which Were Automobile Accident Claims |
|---|---|
| Less than $200 | 80.3% (53 out of 66) |
| $  200 — $500 | 61.4% (70 out of 114) |
| $  500 — $1,000 | 59.3% (92 out of 155) |
| $1,000 — $2,000 | 59.8% (100 out of 167) |
| $2,000 — $3,000 | 39.4% (28 out of 71) |
| $3,000 — $4,000 | 56.2% (27 out of 48) |
| $4,000 — $5,000 | 56.7% (21 out of 37) |
| $5,000 — $10,000 | 53.7% (57 out of 106) |
| over $10,000 | 47.8% (44 out of 92) |

[12] We confine our statistics to cases tried by jury because of the increased time and expense a jury trial necessitates and because most motor vehicle torts brought to trial are in fact tried by jury. In the year covered by the

We recognize these statistics are dated and in any event not determinative. The percentages indicate in general, however, that with the increase in size of the verdict the likelihood that it was rendered in an automobile accident case steadily decreased. In addition it should be noted that in absolute numbers there were far more verdicts in automobile accident cases in the 0 to $2,000 range (315) than in the $2,000 and up range (177). Even accounting for the decrease in the value of money since 1956, this statistic still indicates that a great many, if not the majority of, claims which before were taken to court could be handled under c. 670 with approximately the same monetary return to the claimant, since personal injury protection benefits provide for compensation up to $2,000 of all elements of damage for which tort recovery was before possible except pain and suffering and twenty-five per cent of lost wages. Finally, these statistics should be considered in light of two further facts. First, at the time they were compiled, the minimum cost of a jury trial was estimated at $750 a day, a figure which has since undergone a great increase, and, secondly, the figures do not reflect at all those cases in which a verdict for the defendant was returned.[13]

Other nonAmerican court systems, heirs with ourselves of the common law, have managed to solve this problem of the superabundance of motor vehicle tort claims in one way or another. It remains, however, a cancer to be rooted out in American courts. Presumably the Legislature had this in mind. Chapter 670, in providing for limited recovery without the necessity for adversary proceedings in automobile accident cases, was an appropriate step to alleviate this problem which defied more conservative solutions.[14]

---

table, for example, 1,205 motor vehicle torts were tried by jury and 214 to a judge.

[13] We note that in 1956 422 out of 579 jury verdicts for the defendant were in motor vehicle torts.

[14] The relief to the courts thus provided is not vitiated by the further provision that insurers who pay personal injury protection benefits are subrogated to the rights of their insured and may seek reimbursement from the tortfeasor's insurer. This ultimate adjustment of costs is to be reached through agreement, or arbitration which must precede recourse to the courts. This feature of c. 670 in fact gives added support to the reasonableness of the legislative effort to resolve a pressing court problem.

Nor was court congestion the only problem at which c. 670 might have been aimed. The high cost of automobile insurance in Massachusetts was a present fact of which the Legislature did not need to be reminded. It might have suspected that there was a correlation between this high cost and the inefficiencies and administrative expense involved in running the traditional system, contributed to heavily by the prevalence of the elaborate pre-trial proceedings detailed above. That any such suspicion would have been well founded was confirmed by a report of the United States Department of Transportation released in March of this year entitled, "Motor Vehicle Crash Losses and their Compensation in the United States; a Report to the Congress and the President." The report concluded on this subject that "[t]he automobile accident tort liability insurance system would appear to possess the highly dubious distinction of having probably the highest cost/benefit ratio of any major compensation system currently in operation in this country. As has been shown, for every dollar of net benefits that it provides to victims, it consumes about a dollar." P. 95.

Finally, and not to be discounted among the evils associated with automobiles which c. 670 might have been designed to cure, are the inequities which have been visited upon claimants. In this regard the Legislature might have felt, as expressed in the Department of Transportation Report, that "[t]he present tort liability reparations system allocates benefits very unevenly among the limited number of victims that it purports to serve." P. 94.[15] The Legislature was also presumably aware of the long delays in getting financial aid to the injured person, confronted with medical and subsistence bills during a period of no employment for him and want for his family. The time spent in investigation, the time required for proof of negligence, the

---

[15] This report was not, of course, available to the Legislature when it considered c. 670, but its conclusions are hardly new ones. See e.g., Keeton and O'Connell, Basic Protection for the Traffic Victim, a report published in 1965 which cited the flaws in the operation of the traditional system and proposed a system based on no-fault which was the genesis of c. 670.

exaggerated claims, the all too common suspicion of per-
jured testimony, the horse and buggy approach to a twentieth
century dilemma — all of this might well have influenced
the Legislature, recognizing the right and need of all ac-
cident victims to simple and speedy justice, toward reform.

It cannot be seriously argued that it was beyond legislative
competence to assess this situation and to effect the neces-
sary statutory repair. What we have discussed are evils
which it was within the province of the Legislature to con-
sider and which it endeavored to correct or eliminate. We
do not intimate that the legislative determination which is
c. 670 was the only answer or solution to the problem, but
it cannot be successfully maintained that its salient pro-
visions, as outlined above, are not a rational approach to
the solution of these patent inefficiencies and inequities.

C. *Does c. 670 provide a reasonable substitution for prior
rights?* We are urged to apply a test derived largely from
the suggestion in *New York Cent. R.R.* v. *White,* 243 U. S.
188, 201, that a State might not have the power under the
due process clause "suddenly [to] set aside all common-law
rules respecting liability as between employer and em-
ployee, without providing a reasonably just substitute. . . .
[I]t perhaps may be doubted whether the State could abolish
all rights of action on the one hand, or all defenses on the
other, without setting up something adequate in their
stead." The proposed test may best be considered and
understood, therefore, in the light of the facts before the
court in that case.[16]

The Workmen's Compensation Act dealt with in the *White*
case substituted an administrative system of compensation
for the common law rights of employees engaged in hazard-
ous employments. The new system was compulsory on both
employers and employees. The employee injured or killed
in the course of his employment was entitled to a fixed
compensation according to a prescribed schedule without

---

[16] We intimate no opinion as to whether, and if so in what circumstances,
the application of this test is constitutionally required.

regard to fault in almost every case. At common law the employee's rights against his employer were considerably circumscribed in fact by certain defences available to the employer. Where he could succeed in making out a case, however, the employee stood to gain a great deal more from a jury than he would receive under workmen's compensation. Viewing the overall operation and effect of the statute on both parties affected by it, the court indicated that the exchange of rights was adequate. With respect to the statute's effect on employees, it gave the following reasons: "If the employee is no longer able to recover as much as before in case of being injured through the employer's negligence, he is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty and expense of establishing negligence or proving the amount of the damages." P. 201.

It is immediately apparent that c. 670 alters prior legal rights to a much less drastic extent than did the act involved in the *White* case. However, the overall difference in status quo effected by c. 670 may be described in part in much the same terms as those used by the court in the *White* case.

In considering the effect of c. 670, we cannot view it from the point of view of plaintiffs and defendants, for these are not preëxisting categories as are the employers and employees affected by a workmen's compensation act. Every driver is a potential plaintiff and, equally, a potential defendant. The desired effect of c. 670 on all motorists alike is initially to make available to them compulsory insurance at lower rates due to the savings to insurance companies in administrative expenses and total payments which are expected to follow from c. 670. If injury occurs on the road, motorists are assured of the probability of quick and efficient payment of the first $2,000 of defined losses incurred. In cases of accidents in which the motorist was not negligent, he avoids the uncertainty, delay and cost of a tort proceeding. He still retains the option of recovering more by litigation if he so wishes and the facts so warrant. Although c. 670

may also have the effect of depriving him of his damages for pain and suffering in such an instance, the exchange of rights involved with respect to the driver in an accident in which he was not negligent bears considerable resemblance to that effected by the statute in the *White* case with respect to employees.

This exchange of rights cannot be viewed in isolation, however, for non-negligent drivers are not a distinct class. To it must be added the effect of c. 670 on the driver in a case where he has been negligent or where negligence cannot be determined. In this situation, rather than no compensation for his own injuries, c. 670 accords him the same benefits he would have if he were non-negligent.[17] In addition, he is afforded immunity from liability to the extent other injured parties are eligible for benefits. And, just as his right to sue for pain and suffering is limited when he is non-negligent, so he is protected from comparable claims where he has been negligent. The effect of c. 670 on Massachusetts motorists thus is to provide benefits in return for affected rights at least as adequate as those provided to New York employers and employees in return for rights taken by the act in the *White* case.

It may be argued that c. 670 affects a second distinct class of persons, the pedestrian, and that the exchange of rights effected on this class must be considered separately from its effect on drivers. It is obvious, however, that all drivers are at some moment in time pedestrians. With this realization, the class of pedestrians as distinct from drivers is sharply reduced. Whether or not we define the class to include pedestrians who also drive, however, the effect of c. 670 on that class is no different from its effect on drivers.

---

[17] The day has long since passed when legal negligence in the automobile accident situation could be equated with moral culpability. The whole concept of negligence has in fact become something of a fiction, since in many cases fault cannot meaningfully be placed on any one of the parties more than on another. The new comparative negligence statute is a recognition of this inherent difficulty of assigning fault to one party only. The legally negligent driver is therefore morally as entitled to compensation as the other parties. It should be noted in addition that in defined cases where he is clearly culpable, the injured party is denied benefits under c. 670.

Pedestrians, too, may be negligent or non-negligent; they, too, are therefore afforded the certainty of prompt recovery of a limited amount and limited exemption from liability instead of the necessity of tort proceedings or no compensation at all and liability to an unlimited amount. The fact that the non-car owner is not advantageously affected by lower insurance premiums by no means vitiates the adequacy of the exchange of rights as it operates on him. A similar analysis may be applied to any other nonmotorist who in a given instance happens to come within the scope of c. 670.

D. *Do specific provisions of c. 670 violate due process?* Having answered the plaintiff's claim that the operation and effect of c. 670 as a whole is violative of due process, we turn to several other challenges based likewise on the due process clause which focus on specific provisions of c. 670. The same general test of reasonableness in relation to a proper legislative objective is applicable to these narrower attacks. However, since they are unrelated to the fact that c. 670 as a whole alters prior rights, the reasonably just substitute test which we also discussed in considering the statute as a whole is not material here.

The plaintiff argues that c. 670 deprives him of due process inasmuch as it forces him to insure against loss or injury to himself through a private, profit-making corporation. There is no constitutional infirmity, however, in the self-insurance feature of c. 670. First, contrary to the plaintiff's claim, it is not required. Every motor vehicle owner has the option under c. 670 of electing a deductible which will exclude him entirely from personal injury protection benefits. Even if the self-insurance were compulsory, however, it would create no constitutional problems. Any doubts as to the power of the Legislature to require the citizen, for the good of the public as a whole, to take measures for his own benefit have long since been settled in a series of cases sustaining such statutes. The fact that in many of these cases this feature of the act was not even attacked indicates the lack of gravity of the objection. *Howes Bros. Co. v. Unemployment Compensation Commn.* 296 Mass. 275, 286

(unemployment compensation act, requiring contributions from employees as well as employers). *Commonwealth* v. *Howie,* 354 Mass. 769 (statute requiring motorcyclists to purchase protective headgear). *Carmichael* v. *Southern Coal & Coke Co.* 301 U. S. 495, 505–506 (Alabama Unemployment Compensation Act, requiring contributions from employees as well as employers). *Helvering* v. *Davis,* 301 U. S. 619, 634–635 (Social Security Act setting up "Federal Old-Age Benefits," requiring contributions from employees through a special income tax deducted from their wages).

Nor can the plaintiff complain because the medium through which the optional self-protection must be obtained is a private, profit-making corporation, as opposed to some kind of governmentally managed pool. A virtually indistinguishable mechanism was provided by the Legislature when it first required compulsory liability insurance for motor vehicles, and we sustained it. *Opinion of the Justices,* 251 Mass. 569. In addition insurers are, of course, subject to State regulation both in the setting of premiums and in the conduct of their business. We see no distinction for due process purposes between the requirement of private insurance for self-protection and for the protection of others. It is an incidental and completely nonobjectionable concomitant of many regulatory statutes that citizens are required thereby to enter into transactions for their own benefit with private corporations. G. L. c. 90, § 7 (motorcyclists' protective headgear). G. L. c. 90, § 7A (motor vehicle inspection by private garages).

It is asserted secondly that since premiums under c. 670 are set according to the same basis used for premiums under the preëxisting compulsory liability insurance there is a violation of due process in that each owner in a territory or class pays the same unallocated, undifferentiated premium for his total compulsory insurance. It is argued that the insured, by virtue of the amount of his wages or the extent of his wage continuation program, may be forced to pay for a program of benefits not available to him to the same extent that it may be to another paying the same premium.

There is no substance in the argument. First, it is doubtful whether it may properly be raised in this proceeding. The premiums for personal injury protection coverage are fixed by the Commissioner of Insurance under G. L. c. 175, § 113B, which also provides for review of the rates so set at the request of any person or company aggrieved thereby. Assuming the issue may be raised here, the plaintiff ignores the deductible option, which allows each person to tailor his coverage to his collateral sources of recovery. Secondly, the ultimate allocation of costs under c. 670 is made to territories and classifications of risks essentially as prior to January 1, 1971. As mentioned in fn. 14, the insurer is subrogated to the extent that it pays personal injury protection benefits to the rights of the recipient thereof. It is entitled to reimbursement of the benefits it paid from the insurer of the party who would have been liable in tort but for the exemption from liability contained in c. 670. For these two reasons, therefore, the objection is largely misplaced.

In any event, there is authority in abundance sustaining fixed rates even though they fall unequally on some, where a more precise calculation would be administratively unfeasible. *Brest* v. *Commissioner of Ins.* 270 Mass. 7, 14–15. *Schlabach* v. *Commissioner of Ins.* 290 Mass. 585. This is the case here, where the basis for premiums suggested by the plaintiff is dependent on wages, other forms of insurance, and participation in a wage continuation plan, all of which are subject to change at any time. The burden is not on the Legislature to prove that an alternative method is not feasible. It has wide discretion in this area and we see no basis for holding that it has abused it here. *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 286 (unemployment fund contributions need not be apportioned according to industries' relative unemployment rates). *Lowell Co-op. Bank* v. *Co-operative Cent. Bank,* 287 Mass. 338, 347 (insurance levy on banks need not be fixed according to their financial condition). See *Carmichael* v. *Southern Coal & Coke Co.* 301 U. S. 495, 520–521 (benefits

paid under Unemployment Compensation Act of Alabama need not be related in every case to persons taxed and amount of tax they pay).

The plaintiff objects to the requirement that the insured look first to a wage continuation plan before he may receive benefits for lost wages under c. 670. He cites no authority for his objection, and under applicable constitutional principles the Legislature could properly limit double reimbursement for the same loss. In any event, c. 670 in no way prevents him from obtaining such double recovery through his residual tort action. In addition, it provides for automatic subsequent reimbursement by the insurer of prior reductions in benefits due to a wage continuation plan in certain circumstances.

Two final due process objections which have been raised do not involve the facts of this case. The first is directed at the provision that a policyholder may elect a deductible applicable not only to himself but to members of his household. The second is the claim that the extension of personal injury protection benefits in lieu of damages to the "pure pedestrian," who neither owns a car nor is a member of a household which owns one, is a deprivation to him of due process. We treat with neither pursuant to our statement at the outset of this opinion that we would confine ourselves to issues raised on the facts.

### EQUAL PROTECTION ISSUES.

A. *Applicable principles.* The plaintiff has leveled two attacks against c. 670 based on a denial of equal protection of the laws, both directed at the classification in § 5 of cases for which pain and suffering are recoverable. Again it is helpful to state at the outset the general principles which are applicable under the equal protection clause. A principle analogous to that we applied to due process issues is likewise applicable where a legislative classification is attacked as a violation of equal protection: if the legislative difference in treatment is reasonably related to a legitimate

public purpose, it is permissible. *McQuade* v. *New York Cent. R.R.* 320 Mass. 35, 38. *Maher* v. *Brookline,* 339 Mass. 209, 213. *Hall-Omar Baking Co.* v. *Commissioner of Labor and Indus.* 344 Mass. 695, 700. *Watson* v. *Maryland,* 218 U. S. 173, 178. *McGowan* v. *Maryland,* 366 U. S. 420, 425–426. *McDonald* v. *Board of Election Commrs.* 394 U. S. 802, 809. The same subsidiary presumption of constitutionality is present in this context also, as is the required use of any reasonably conceivable set of facts to justify the classification. *McGowan* v. *Maryland, supra,* at 426. There is no requirement that there be any legislative record or findings in support of the classification. *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 695. The equal protection clause thus limits legislative discretion in delineating classifications only to the extent of forbidding "arbitrary or irrational" classifications (*Opinion of the Justices,* 251 Mass. 569, 601), or discrimination which is "invidious." *Williamson* v. *Lee Optical of Oklahoma, Inc.* 348 U. S. 483, 489.

B. *Does the classification in § 5 of c. 670 bear a rational relationship to a proper legislative objective?* The plaintiff claims that the criteria delineating when pain and suffering are recoverable are arbitrary and unreasonable. The purpose of the Legislature in limiting recovery in this way was clearly to eliminate minor claims for pain and suffering. We have already described the crisis faced by the courts of the Commonwealth and the part played by the abundance of personal injury claims in contributing to it. The Legislature could reasonably have thought that the number of such cases was largely attributable to speculative and exaggerated claims for pain and suffering in instances of relatively minor injury. As is well known, the subjective complaint of pain and suffering defies accurate monetary appraisal. In addition, the time and expense necessary to investigate these claims might well have been perceived to be a burden both on the insurance industry and ultimately on the motoring public. Minor "nuisance" claims were often overpaid by insurers in order to avoid the expense of defending them,

and the common knowledge of this practice only served to perpetuate them. It was clearly proper for the Legislature to conclude that the benefits of compensating an injured person for relatively minor pain and suffering, which as such entails no monetary loss, did not warrant continuation of the practice when balanced against the evils it had spawned.

A necessary corollary of this decision was that the minor claims had to be eliminated according to objective, easily applicable rules. If the rules were themselves subjective — for instance, keyed to the dollar amount of pain and suffering involved — the perceived evils would continue. Courts might well be clogged with claimants alleging damages over the required figure, and there would remain the incentive for the injured party to exaggerate his claim in order to prompt a generous settlement from an insurer which did not feel the claim was worth the expense of a contest.

The only question that remains, therefore, is whether the objective criteria the Legislature chose are rationally related to their purpose of eliminating minor claims for pain and suffering. We think there can be no doubt that they are. The plaintiff's attack is leveled chiefly at the general rule that reasonable and necessary medical expenses must be over $500 to allow recovery for pain and suffering. There is no objection to the mitigation of this rule by the criteria of death, loss of a body member, permanent and serious disfigurement, or loss of sight or hearing. Our attention has been drawn, however, to the contrast between the comparatively minor pain and suffering which may result from a minor fracture and the serious and long-continued pain and suffering which may result in cases for which the statute denies recovery. It is argued that the $500 limit will exclude many sizable claims for pain and suffering which do not at the same time fall within the five other categories. No doubt this is so. Nor do we doubt that relatively minor claims for pain and suffering may be permitted in some cases, particularly in the fracture category. But fracture, like the $500 limit and the other four criteria based on the type of

injury, is susceptible of objective and reasonably certain verification. In addition, many cases of fracture, perhaps most, are likely to involve substantial pain and suffering. "The problems of government are practical ones and may justify, if they do not require, rough accommodations — illogical, it may be, and unscientific." *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, 69–70. Some inequality in result is not enough to vitiate a legislative classification grounded in reason. *Lindsley* v. *National Carbonic Gas. Co.* 220 U. S. 61, 78. It seems to us that the Legislature has employed criteria rationally related to seriousness of injury in general, and thereby to seriousness of pain and suffering. Whether fracture should be included as a category, at the risk of allowing some minor claims for pain and suffering, is within the permissible range of judgment.

As to the amount of reasonable and necessary medical expenses, it is constitutionally irrelevant that the actual point of demarcation had necessarily to be arbitrary. As was stated by Mr. Justice Holmes in *Louisville Gas & Elec. Co.* v. *Coleman,* 277 U. S. 32, 41, "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." Such distinctions of degree expressed in terms of differences in number have been particularly subject to attack. However, they have been just as widely upheld as a determination which was peculiarly a question for legislative decision. *St. Louis Consol. Coal Co.* v. *Illinois,* 185 U. S. 203, 207 (coal mines employing five or more persons subject to inspection). *McLean* v. *Arkansas,* 211 U. S. 539,

551–552 (mines employing ten or more persons required to measure coal for payment of wages before screening). *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 576–577. *Booth* v. *Indiana*, 237 U. S. 391, 397–398 (mines required to supply wash-houses upon demand of twenty employees). *Middleton* v. *Texas Power & Light Co.* 249 U. S. 152, 159 (employers of five or more persons included within workmen's compensation act). *Carmichael* v. *Southern Coal & Coke Co.* 301 U. S. 495, 510–512 (exemption of employers of less than eight persons from the Unemployment Compensation Act). It is clear that the $500 figure chosen here by the Legislature, although no more nor less reasonable than a higher or lower figure within a substantial range, is not subject to constitutional attack.

It is alleged in addition that the $500 limit operates as an invidious discrimination against the poor because they are charged less than others for medical care. Passing over the plaintiff's lack of standing to make this argument, it may be briefly dismissed on the ground that the plaintiff has failed to come forward with any evidence that this is in fact the case. See *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life*, 319 Mass. 301, 305.

### CONCLUSION.

Finally, argument has been made to us that c. 670 violates art. 11 (remedies by recourse to the law to be free, complete and prompt), art. 15 (right to trial by jury sacred), and art. 30 (separation of executive, judicial and legislative departments), all of which articles are contained in the Declaration of Rights of the Massachusetts Constitution, and Part II, c. 1, § 1, art. 4, which sets forth various powers of the Legislature. We see no necessity for a discussion of c. 670 in the light of these constitutional provisions. It is entirely clear that the statute violates none of them.

A decree is to enter in the county court declaring (1) that St. 1970, c. 670 and c. 744, as applied to the plaintiff are constitutional under both Federal and State Constitutions,

and (2) that the defendant is not liable to the plaintiff for pain and suffering or for any damages covered by the personal injury protection benefits to which the plaintiff is entitled under his own motor vehicle liability policy as defined in G. L. c. 90, §. 34A.

*So ordered.*

TAURO, C.J. (concurring). I concur in the result reached by the court, but I am constrained to disagree with much of the reasoning by which this result has been reached.

Considering the application of established principles of law to the limited record before us, the court has no alternative but to conclude that St. 1970, c. 670, and the amendatory provisions of St. 1970, c. 744, are constitutional.

All legislative enactments are presumed to be constitutionally valid. The Legislature, when it acts, "is presumed to be supported by facts known to the legislature unless facts judicially known or proved preclude that possibility." *South Carolina State Hy. Dept.* v. *Barnwell Bros. Inc.* 303 U. S. 177, 191. "All rational presumptions are made in favor of the validity of every legislative enactment. Enforcement is to be refused only when it is in manifest excess of legislative power." *Commonwealth* v. *Finnigan*, 326 Mass. 378, 379. See *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 284; *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 192; *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138; *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422. "Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution." *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418. See also *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life*, 319 Mass. 301, 305; *Commonwealth* v. *Chamberlain*, 343 Mass. 49, 51–52; *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.* 282 U. S. 251, 257–258; *Borden's Farm Prod. Co. Inc.* v.

*Baldwin,* 293 U. S. 194, 209–210; *Pacific States Box & Basket Co.* v. *White,* 296 U. S. 176, 185. *United States* v. *Carolene Prod. Co.* 304 U. S. 144, 154. By employing this restrictive standard of judicial review, questions "fairly open to differences of opinion" are left to the judgment of the Legislature. *Old Dearborn Distrib. Co.* v. *Seagram-Distillers Corp.* 299 U. S. 183, 196. *Simon* v. *Needham,* 311 Mass. 560, 564. *Foster* v. *Mayor of Beverly,* 315 Mass. 567, 572. *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 594–595. *Druzik* v. *Board of Health of Haverhill, supra,* at 138–139.

The court has properly concluded that the plaintiff has failed to sustain this burden of proof, a virtually insuperable task in the circumstances. To say, however, that it follows from this negative conclusion that the Legislature has acted wisely or even expediently in enacting the no-fault insurance law is a non sequitur. In my view the court is not presently in a position to form a proper judgment as to the wisdom or desirability of the no-fault statutes. Nor should we, in any event, attempt to do so. "It is not for us to inquire into the expediency or the wisdom of the legislative judgment." *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life, supra,* at 418. *Slome* v. *Chief of Police of Fitchburg, supra,* at 189. The court might well have rested its decision solely on the basis of the plaintiff's failure to sustain his burden of proof. Nevertheless, despite the absence of any prior judicial fact-finding proceeding, the court gratuitously discusses at great length the reasonableness and merits of the legislation in question. In so doing, the court indulges in much speculation as to the Legislature's intent and as to the existence of the "facts" purportedly underlying the Legislature's action and, in the process, understates the departures from preëxisting tort law. Moreover, the court, in view of the experimental nature of the no-fault law, is unduly generous in assessing its attributes and overly optimistic as to its ultimate success. Nor is there any saving grace in the statement by the court that no-fault may not be the sole solution. Implicit in this statement is the premise that no-fault *is* a

solution. This is a conclusion that cannot be reached presently on any sound basis of fact or experience.

Given the context and posture in which these important issues have been presented to us, I believe that a more appropriate approach could have been followed and a more useful purpose served had the court opinion subjected the legal principles underlying the no-fault insurance law to more severe and objective critical analysis and avoided endorsement of the social policy in dispute. This is especially true in a case such as this with its vast implications and where additional constitutional challenges undoubtedly will be made concerning other aspects of the statute.

A novel statute, denying a long-standing common law right to a substantial number — if not a majority — of persons injured by another's negligence indeed presents a "solemn occasion." Any law so drastically altering legal rights and liabilities deserves minute scrutiny and analysis. Although a potential personal injury claim may not rise to the level of a vested property right, as maintained by the defendant, the courts, nonetheless, must scrupulously insure that no person is deprived of *any* right by arbitrary legislative action.

The reduction of automobile insurance premiums and the removal from the courts of frivolous and even fictitious claims for pain and suffering allegedly associated with injuries received in automobile accidents is undeniably a most desirable objective.

I agree that the volume of such claims and the manner of their disposal undermined the former compulsory insurance law, causing its failure. The elimination of these claims is of paramount importance to the success of any alternative plan of insurance. No plan, however, should resort to "burning down the barn to get rid of the mice." See fn. 1.

Our Commonwealth's Constitution does recognize that principles of the common law in use at the time of its adoption are subject to legislative modification. Massachusetts Constitution, Part II, c. 6, art. 6. The Legislature may alter common law rights, liabilities and remedies at least

where a suitable and effective alternative is provided and no fundamental rights are affected. *Opinion of the Justices,* 309 Mass. 571, 599.

The issue, however, is not nearly so clear-cut as the court suggests. The parties have stipulated that the plaintiff, prior to the no-fault law would have been entitled to $1,565 in damages. It would require much more than ordinary powers of persuasion to convince the plaintiff in the instant case that, in comparison to the exchange of rights and defences under the workmen's compensation law, he is just as well off (as the defendant maintains) to receive a fraction of the $1,565.

The court relies heavily on *Silver* v. *Silver,* 280 U. S. 117, and *Hanfgarn* v. *Mark,* 274 N. Y. 22, app. dism. 302 U. S. 641. The *Silver* case, however, was decided on narrow equal protection grounds. 280 U. S. at 122. The *Hanfgarn* case and other decisions upholding the legislative power to enact "Heart Balm" statutes generally rest on the State's plenary power over the institution of marriage. See *Langdon* v. *Sayre,* 74 Cal. App. 2d 41; *Fearon* v. *Treanor,* 272 N. Y. 268; Clark, Law of Domestic Relations 15–22. Compare *Daily* v. *Parker,* 61 F. Supp. 701 (N.D. Ill.); *Zaremba* v. *Skurdialis,* 395 Ill. 437, and *Heck* v. *Schupp,* 394 Ill. 296, in which the Illinois "Heart Balm" statute was declared unconstitutional. The constitutionality of our "Heart Balm" statute, G. L. c. 207, § 47A, was not decided in *Thibault* v. *Lalumiere,* 318 Mass. 72, simply because the issue was not raised. Furthermore, the broad holding of *Thibault* v. *Lalumiere* was subsequently limited by this court on nonconstitutional grounds in *De Cicco* v. *Barker,* 339 Mass. 457.

The analogy of no-fault insurance to workmen's compensation is also overly simplified. Without dwelling on the history of workmen's compensation legislation and litigation in Massachusetts, it should be noted that "[t]he workmen's compensation act (except in Part II) is not an amendment to the common law, but the establishment of heretofore unknown obligations, compensations and methods

of procedure . . . . As stated in the Report of the Massachusetts Commission on Compensation for Industrial Accidents submitted in 1912, which framed the act adopted by the Legislature . . . at page 46: 'The Massachusetts law may be briefly characterized as an elective compensation insurance law giving compensation for all injuries arising out of employment irrespective of negligence . . . . The basic principle of the act is that the cost of injuries incidental to modern industry should be treated as a part of the cost of production. The act was framed with that end in view.'" *Duart* v. *Simmons*, 231 Mass. 313, 318–319. The court's reliance upon *New York Cent. R.R.* v. *White*, 243 U. S. 188, a case arising under the laws and Constitution of New York, without alluding to the constitutional history surrounding the enactment of the New York workmen's compensation law, is misplaced. *Ives* v. *South Buffalo Ry.* 201 N. Y. 271. Strikingly, in this respect, discussion of the Massachusetts cases upholding the constitutionality of our Workmen's Compensation Act is omitted. See general discussions in *Opinion of the Justices*, 309 Mass. 562, and *Opinion of the Justices*, 309 Mass. 571.

Parenthetically, our workmen's compensation law, which was drafted for the benefit of the employee, and not to reduce insurance rates, still permits an employee to retain his common law rights as an alternative to coverage by workmen's compensation. More significant is that workmen's compensation *creates no classifications for employees and treats equally all persons coming within its coverage.*

When the Legislature clearly oversteps the limits of its police power and enacts a statute, recognizable on its face as violative of fundamental precepts of constitutional law, the courts may adequately review such actions purely on the basis of legal arguments. In matters not so patently offensive — or permissible, for that matter — the courts' ability to scrutinize legislative acts is severely limited and circumscribed. In addition to legal arguments, the courts may take judicial notice of indisputable and either generally known or easily ascertainable facts. See the "plethora" of

cases compiled in Leach and Liacos, Handbook of Massa-
chusetts Evidence, at 34–39. "Where the existence of a
rational basis for legislation whose constitutionality is at-
tacked depends upon facts beyond the sphere of judicial
notice, such facts may properly be made the subject of ju-
dicial inquiry." *United States* v. *Carolene Prod. Co.* 304
U. S. 144, 153. See *Commonwealth* v. *Leis*, 355 Mass. 189;
*Chastleton Corp.* v. *Sinclair*, 264 U. S. 543, 547–549; *Borden's
Farm Prod. Co. Inc.* v. *Baldwin*, 293 U. S. 194; *South
Carolina State Hy. Dept.* v. *Barnwell Bros. Inc.* 303 U. S. 177;
Karst, Legislative Facts in Constitutional Litigation, 1960
Sup. Ct. Rev. 75; Alfange, The Relevance of Legislative
Facts in Constitutional Law, 114 U. of Pa. L. Rev. 637;
Note, The Presentation of Facts Underlying the Constitu-
tionality of Statutes, 49 Harv. L. Rev. 631. Particularly
where the issue is novel and complex, it may be proper to
permit judicial inquiry into relevant facts underlying the
enactment of the statute in question. The scope of the
hearing should be sufficiently broad in the circumstances to
allow a judicial determination regarding the asserted ar-
bitrariness, irrationality or discriminatory effects of the
statute under attack. *Commonwealth* v. *Leis, supra.*

No such judicial inquiry was made in this case and, thus,
the court's opinion must be interpreted accordingly. I do
not speculate whether the holding of such an evidentiary
proceeding would have led to a different result, but it might
have eliminated any conjecture as to what facts the Legis-
lature may reasonably have conceived to exist and con-
sidered.

I do not intend that the courts should set themselves up
as "super-Legislatures." However, by careful use of evi-
dentiary inquiries in appropriate circumstances, the courts
might avoid becoming virtual rubber stamps in upholding
the constitutionality of challenged legislation on the basis of
abstract and perhaps necessarily superficial review of an in-
adequate record. I personally experience a deep sense of
frustration in being compelled to sit in review of so im-
portant a case as this without the benefit of controlling

factual determinations which might have resulted from a prior judicial inquiry.

One of the most important and difficult issues raised by this case, for example, is the classification system adopted whereby claimants are denied their former common law right to seek damages in a jury trial for pain and suffering associated with injuries received in a motor vehicle accident unless they incur reasonable medical expenses exceeding $500 or suffer death, any form of fracture regardless of its degree of severity, loss of sight or hearing, partial or total loss of a bodily member, or serious and permanent disfigurement. It is argued that one of the intended purposes of this legislative classification is the elimination from the courts of minor and, supposedly by definition "nuisance," claims for pain and suffering. Yet, this case has not been presented in a manner that would make us aware of any facts conceivably considered or ignored by the Legislature in appraising *any possible relationship between the extent of reasonable medical expenses and the legitimacy of claims for pain and suffering.* In fact, specific questions were put by me to counsel on both sides during oral argument but no information was available to us as to the approximate percentage of automobile tort cases in which the reasonable medical expenses do not excede $500.[1] In *supporting* this new and experimental no-fault insurance law (in addition to ruling on its constitutionality), the court, in my view, has ventured needlessly into the realm of speculation and conjecture.

I entertain still further doubts as to the reasonableness of other aspects of the statutory classification system of the no-fault insurance law both on due process and equal protection grounds. For example, a slight linear fracture of a single bone in the little finger, regardless of the amount of resulting medical expenses, would permit a suit for pain and

---

[1] Unfortunately, in the absence of verified statistics, there can be no determination of the actual effect of this particular standard on tort claims resulting from automobile accidents. However, even conservative estimates from official sources indicate that medical expenses may not exceed $500 in as many as eighty to ninety per cent of all automobile tort claims.

suffering under the no-fault plan with the concomitant right
to a jury trial. On the contrary, absent reasonable medical
expenses in excess of $500 or one of the other criteria specifi-
cally enumerated in the statute, a person suffering serious
disability from torn muscles, tendons or ligaments or from
sprained or dislocated joints, may not seek damages in court
for the pain and suffering associated with such an injury.
Under similar circumstances the right to seek recovery is
also denied in cases of a speech defect or diminution or loss
of the sense of taste caused by injury to the tongue, diminu-
tion or loss of the sense of touch from an injury to a nerve,
an injury to the nose causing a diminution or loss of the
sense of smell, a rupture of a cervical disc, contusions or
lacerations of the brain which occur even without a fracture
of the skull or other serious injuries to vital internal organs.
Furthermore, at least to the extent of the $2,000 exclusionary
provision of the no-fault law, such persons would be subject
to a different measure of damages than the victims of other
torts as regards economic losses resulting from their in-
ability to work. It is no response to surmise that most
persons in such circumstances would incur reasonable medical
expenses exceeding $500. The court has no basis for such a
conclusion.

Calling attention to his prior service as Chief Justice of
the Superior Court, the author of the court's opinion sug-
gests that the eradication of the "cancer" of automobile
tort litigation and its "devastating effect upon the adminis-
tration of justice" supports the enactment of the no-fault
insurance law.

While recognizing the impact of the motor vehicle upon
our judicial system, I believe that the impression conveyed
by the court in this regard ought to be clarified. Admittedly,
a high percentage of the civil entries in the Superior Court
involve motor vehicle torts. Yet, the court nowhere indi-
cates what percentage of such cases are transferred to the
District Courts and the Municipal Court of the City of
Boston for disposition. In fact, the no-fault law should
have little, if any, effect upon the judicial workload of the

Superior Court since most motor vehicle cases now subject to the limitations of the no-fault law remain, in general, subject also to the provisions of the transfer statute. G. L. c. 231, § 102C. Rule 33A of the Superior Court (1954).

No mention is made by the court of the small percentage of motor vehicle tort cases entered that are ever tried in the Superior Court. A careful survey conducted by the clerk's office in Suffolk County in 1967 indicated that only thirteen per cent of Superior Court judges' time is spent in the trial of motor vehicle tort cases. Surveys conducted in other jurisdictions tend to verify this finding. See The Law's Explosion, 44 J. of Am. Ins. 18 (Nov.–Dec. 1968).[2] Of the remaining eighty-seven per cent of the Superior Court judges' time, the greatest portion is spent on the trial and disposition of criminal cases. The rest, far exceeding the time spent on motor vehicle tort cases, is devoted to a broad range of judicial matters including land damage, medical malpractice, products liability, general liability, contract, contested election, unfair labor practices and equity cases, petitions seeking the issuance of extraordinary writs, commitments of narcotics addicts and sexually dangerous persons and judicial review of the decisions of State and municipal regulatory and administrative agencies. There is no denying that motor vehicle litigation has some impact on the courts, especially at the administrative level of the clerks' offices. I respectfully suggest, however, that to single out the "cancer" of motor vehicle torts as the cause of congestion and delay in the Superior Court is to ignore the facts.

The volume of these cases and of all other forms of civil and criminal litigation do indeed strain our inadequate judicial resources, but, based upon my experience, other

---

[2] Automobile Accident Litigation, A Report of the Federal Judicial Center to the Department of Transportation, April 1970, estimates, at page 7, that motor vehicle accident litigation in the court system occupies seventeen per cent of the system's available resources.

The report also concludes that the impact of motor vehicle tort litigation on the courts relates "to the differences in mean delay of case terminations, i.e., the fewer resources allocated to motor vehicle accident litigation, the greater the corresponding delay." Id. at 7–8.

factors also combine significantly to bring about this aggravated situation — inadequate facilities, a shortage of judges and supporting personnel, an insufficient number of properly trained trial advocates, archaic rules of practice and procedure and outmoded administrative techniques.[3]

The court, I believe, has gone too far in lauding this experimental no-fault insurance plan. It is for this that I have offered my comments and observations in this concurring opinion. Had an evidentiary hearing been held in this case prior to its submission to us, it might have facilitated a more satisfactory resolution of the issues presented.

In the circumstances of this case, it is enough to say that the presumption of constitutional validity must prevail in the absence of some factual foundation specifically brought to our attention that would preclude it. *Commonwealth* v. *Chamberlain*, 343 Mass. 49, 51–52. *Pacific States Box & Basket Co.* v. *White*, 296 U. S. 176, 185. I do not, however, consider the court's decision necessarily dispositive of issues

---

[3] It is generally recognized that there is an urgent need for enlarging the base and improving the competency of the trial bar. There are those who conceive a trial lawyer's practice as being one devoted almost exclusively to the handling of motor vehicle tort cases, and the trial calendar of our Superior Court as being similarly dominated by such cases. This is a gross misconception which does injustice to lawyers who have dedicated their careers to the art of advocacy. It demonstrates also a startling lack of awareness as to the breadth and scope of the business conducted in our "great trial court." The unfortunate effect is that those who foster such misconceptions, whether through ignorance or indifference, have served to discourage young lawyers from a career in trial advocacy — to the detriment of both the judicial process and the public alike. This misconception fails to distinguish between lawyers who may have a large negligence practice and yet rarely, if ever, try their cases when settlement is refused and those lawyers who are truly trial advocates — triers of varying types of contested causes, negligence among them. The talents of these advocates are often engaged by other lawyers, much as British solicitors engage barristers. It is this latter group which deserves recognition as being a vital component of our judicial process and whose membership must be expanded if litigants, large and small, are to be represented properly in our courts. After all, our courts do not exist merely for the trial of cases involving great sums of money, or disputes involving corporate giants or substantial property rights. Courts exist also to provide a forum for the redress of grievances for the person whose $500 claim, whether it sounds in contract or in tort, may be just as important to him as a $50,000 claim is to a person of affluence. We must have a sufficiency of dedicated and competent trial lawyers, civil and criminal, and the availability of accessible forums in order to provide equal protection of the laws and "a certain remedy . . . for all injuries or wrongs . . . completely, and without any denial; promptly, and without any delay; conformably to the laws." Massachusetts Constitution, Declaration of Rights, art. 11.

possibly arising by virtue of the application of the no-fault law to different facts.

As an alternative I would remand this case to the Superior Court for the purpose of conducting an appropriate judicial inquiry into those controverted facts, beyond the sphere of judicial notice, upon which the existence of a rational basis for the no-fault insurance plan and the classification system contained within it might depend. See *Borden's Farm Prod. Co. Inc.* v. *Ten Eyck*, 297 U. S. 251.