445 A.2d 763

**William OBDYKE, Appellant,**

v.

**HARLEYSVILLE MUTUAL INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Argued Dec. 4, 1979.

Filed May 14, 1982.

Petition for Allowance of Appeal Granted Aug. 31, 1982.

Albert Ominsky, Philadelphia, for appellant.

William D. March, Media, for appellee.

Before SPAETH, CAVANAUGH and O'KICKI,* JJ.

* Judge JOSEPH F. O'KICKI of the Court of Common Pleas of Cambria County, Pennsylvania is sitting by designation.

SPAETH, Judge:

This is an appeal from an order vacating an arbitration award in an automobile accident case on the ground that there was no "uninsured motorist." We affirm.

On November 2, 1977, William Obdyke, while driving his automobile, was involved in a collision with an automobile driven by one Jose Antonio Mejias. Obdyke's right ankle was broken. Mejias was driving under the influence of alcohol. Obdyke's claim against Mejias was settled by Mejias's insurance carrier, Motor Club of America Insurance Company, for $15,000. Obdyke also filed a claim with his own carrier, Harleysville Mutual Insurance Company, for benefits under his "uninsured motorist" coverage. When Harleysville refused to pay the claim, an arbitration was held. On February 26, 1979, the arbitrators by a 2-to-1 vote awarded Obdyke $15,000. On March 8, 1979, Harleysville petitioned the lower court "to modify, vacate or correct" the arbitrators' award, on the ground that Mejias was not an "uninsured motorist" at the time of the accident. On June 27, 1979, the lower court granted the petition and vacated the award. Obdyke now appeals from that order.

As appellant, Obdyke argues that Harleysville waived any right to object to the arbitration award (and that the lower court therefore erred in vacating the award) by virtue of a provision in the arbitration clause of the policy that "[a] decision agreed to by two of the arbitrators will be binding." This argument was not raised in appellant's answer to Harleysville's petition in the lower court. However, since it could be construed as going to our jurisdiction, we shall consider it.

The arbitration clause provided that arbitration "shall be conducted in accordance with the Pennsylvania Arbitration Act of 1927."[1] Arbitration under the Act of 1927 is

1. Act of April 25, 1927, P.L. 381, No. 248, as amended, 5 P.S. § 161 *et seq.* The Act of 1927 was repealed by the JARA Continuation Act of 1980, Act of October 5, 1980, P.L. 693, No. 142, § 501(c), effective in 60 days. Statutory arbitration is now provided for by sections 7301–7320 of the Judicial Code, 42 Pa.C.S.A. §§ 7301–7320.

subject to much broader judicial review than is common law arbitration. *Wingate Construction Company v. Schweizer Dipple, Inc.,* 419 Pa. 74, 213 A.2d 275 (1965). Section 11(d) of the Act, 5 P.S. § 171(d), provides that on the application of any party the court shall make an order modifying or correcting the award "[w]here the award is against the law, and is such that had it been a verdict of the jury the court would have entered different or other judgment notwithstanding the verdict." *See Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 39 A.2d 139 (1944).

■ This provision for broad judicial review is a critical feature of the Act of 1927. It follows that where an agreement provides for arbitration "in accordance with" the Act, to construe the agreement as precluding broad judicial review would be to construe it in a manner inconsistent with the Act. *See Wingate Construction Company v. Schweizer Dipple, Inc., supra; Emporium Area Joint School Authority v. Anundson Construction and Building Supply Co.,* 191 Pa.Superior Ct. 372, 156 A.2d 554 (1959), *rev'd on other grounds,* 402 Pa. 81, 166 A.2d 269 (1960).

■ Here, a construction consistent with the Act of 1927 is obvious. The provision that "[a] decision agreed to by two of the arbitrators will be binding" simply means that a decision agreed to by two of the three arbitrators is as binding—has the same effect—as a decision agreed to by all three arbitrators. Whether by a majority or unanimous, the decision is subject to the same broad judicial review provided by the Act.

Since it is therefore apparent that Harleysville did not waive its right to petition the lower court to vacate, modify, or correct the award, we may turn to considering whether in vacating the award the lower court erred. In undertaking this consideration, we must draw every inference of fact in favor of appellant as the award winner, but it is also our duty to correct errors of law. *Pennsylvania Turnpike Commission v. Smith, supra.*

Here, the arbitrators made no findings of fact or conclusions of law. In vacating the award, the lower court said that "[i]t is not unreasonable to assume that the Arbitrators concluded that "underinsured" is to be equated with "uninsured." On this assumption the court held the award "patently improper." Slip op. at 3.

It seems likely that the lower court was correct in assuming that two of the three arbitrators concluded that "underinsured" is to be equated with "uninsured," for counsel for appellant argued vigorously to the arbitrators that Mejias was "uninsured" because he was "underinsured." N.T. 34, 47–48, 9/29/78 hearing; N.T. 5–9, 24–30, 1/27/79 hearing. If in fact two of the three arbitrators did equate "underinsured" with "uninsured," the lower court was justified in characterizing their award as "patently improper." This court sitting en banc has very recently held that there is no basis in law or policy for that equation. *Davis v. Government Employees Ins. Co.*, 296 Pa.Superior Ct. 198, 442 A.2d 727 (1982); *see also White v. Concord Mutual Ins. Co.*, 296 Pa.Superior Ct. 171, 442 A.2d 713 (1982).[2]

In *Davis* the claimant had received $24,467 from the tortfeasor's insurance carrier in partial settlement of a claim alleged to be in excess of $100,000. He then sought payment under the uninsured motorist coverage of his own policy; when his carrier declined to pay, he sought arbitration. By a vote of 2 to 1 the arbitrators held that they lacked jurisdiction because under the policy definition—which was the same in all material respects as the definition in appellant's policy—there had been no "uninsured motorist" involved in the accident. The claimant sought judicial review of this holding, arguing among other things that the policy definition of "uninsured" was "contrary to constitutional, legislative or administrative mandate or against public policy or unconscionable." *See Davis v. Government Employees Ins. Co., supra,* 296 Pa.Super. at 203, 442 A.2d at 729–30. Both the lower court and this court en banc rejected this

2. We deferred our decision in this case until the opinions in *Davis* and *White* had been filed.

argument. We noted that the argument that "an automobile covered by a policy in the minimum amount required by the financial responsibility law should nevertheless be held 'uninsured' in the event that the claimant's damages exceed the face of the policy has been uniformly rejected [in other jurisdictions]." *Id.,* 296 Pa.Super. at 203, 442 A.2d at 730 (Citations omitted).

In his brief to us appellant has abandoned the argument that Mejias was "uninsured" because he was "underinsured." Instead, he argues that Mejias was "uninsured" because the limit of his policy was less than the minimum limit required by law.

Appellant's policy with Harleysville defined an "uninsured motor vehicle" as one:

1. to which no bodily injury bond or policy applies at the time of the accident.

2. to which a bodily injury bond or policy applies at the time of the accident but its limits for bodily injury liability is *[sic]* less than the minimum limit for bodily injury liability specified by the Financial Responsibility Law of the State in which your covered auto is principally garaged.

3. which is a hit-and-run vehicle . . .

4. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insurance company denies coverage or is or becomes insolvent.

R.R. 19(a)

As the lower court noted, at the time of the accident the minimum limit of bodily injury liability specified by the Pennsylvania financial responsibility law was $15,000. 75 Pa.C.S.A. § 1747; 40 P.S. § 1009.104. In his brief, appellant asserts that "[a]lthough [appellant's] claim against Mejias was settled for $15,000.00 with MCA [Motor Club of America Insurance Company], the fact remains that the MCA policy had 'limits of bodily injury liability' of $5,000 per person and $10,000 per accident." Brief for Appellant at 6. Since these

limits were less than the minimum limit of $15,000 specified by law, appellant argues, Mejias was "uninsured" within the meaning of paragraph 2 of the definition of "uninsured" in appellant's policy with Harleysville.

There were two hearings before the arbitrators. The first hearing was on September 29, 1978. In the course of the hearing, counsel for appellant asserted that "the Mejias' *[sic]* vehicle had $5,000 bodily injury liability." N.T. 37, 9/29/78. The assertion was contested by counsel for Harleysville as inadmissible hearsay, N.T. 40–41, 43, and after an extended argument, N.T. 37–77, the arbitrators ruled that the assertion was inadmissible. N.T. 77–78. The hearing concluded on the understanding that counsel for appellant would "get the information" as to Mejias's coverage. N.T. 78. The second hearing was on January 29, 1979. At the beginning of this hearing counsel for appellant stated:

> The testimony at the last hearing, if you remember, there was a dispute because I had been notified by Motorists Insurance Company of Boston, Massachusetts, that their liability insurance for this accident was $5,000. That's the policy they wrote. Since that time, with great coaxing on my part and constant correspondence and everything else they have agreed to pay $15,000. Their argument was that it didn't—they didn't think the coverage was there, et cetera, but the agreement was that they'd pay $15,000 as far as Mr. Mejias' liability is concerned.
>
> There's a stipulation that Mr. March and I signed and I think, Bernie, I sent it back to Mr. March because I felt that he sent it to me, so I sent you a copy of it but you now have the original signed stipulation.

N.T. 4, 1/29/79.

Paragraphs 5 and 6 of the stipulation thus referred to read: [3]

> 5. William Obdyke obtained payment from the insurance carrier for Jose Antonio Mejias, Motor Club of America Insurance Company, in the sum of $15,000.00.

**3.** Although counsel for appellant described the stipulation as having been s.gned by himself and counsel for Harleysville, we find in the

6. The limit for bodily injury liability payable under the policy of insurance issued to Jose Antonio Mejias by Motor Club of America Insurance Company applicable to the automobile accident of November 2, 1977 was $15,000.00. Supplemental R.R. 124b.

██ The confusion over Mejias's coverage arose because although on the declaration page of his policy the bodily injury limit (per person) was indicated as $5,000, which satisfied the financial responsibility requirement of his home state, Massachusetts, at the time of the accident, the policy also included a provision that if Mejias was involved in an accident in another state with higher financial responsibility requirements, the coverage under the policy would be increased to that amount. *See* N.T. 71–73, 9/29/78 hearing. We have no difficulty holding as a matter of law that where an out-of-state policy has such an escalation provision, and where an amount at least equal to the Pennsylvania financial responsibility requirement has been paid, the automobile covered by such a policy is not "uninsured," regardless of the limits specified on the declaration page of the policy.

██ In view of the stipulation, in particular paragraph 6, we might have refrained from this holding. When counsel for the parties have stipulated to the arbitrators that the policy limit of the tortfeasor's policy is at least equal to the minimum specified by Pennsylvania law, the arbitrators may not find, and counsel should not argue, that the policy limit was less and that the tortfeasor was therefore uninsured. *In re Monheim's Estate*, 451 Pa. 489, 304 A.2d 115 (1973); *K*

record only a copy of the stipulation without signatures. However, since counsel for appellant has admitted to having signed the stipulation, we shall assume that his statement was correct.

*& C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390 (1970).

AFFIRMED.[4]

O'KICKI, J., files a concurring and dissenting opinion.

O'KICKI, Judge, concurring and dissenting:

I concur in the result of the majority in view of the particular facts of this case. I disagree with the legal reasoning. Counsel for the parties have stipulated to the arbitrators that the limit of the tortfeasor's policy is at least equal to the minimum specified by Pennsylvania law ($15,-000), and have also stipulated that this minimum was paid to the appellant. (Supplemental R.R. 124b). In view of these two facts, the arbitrators may not find that the tortfeasor was uninsured or that the policy limit was less, notwithstanding the fact that the MCA policy on its face had a liability limit of "$5,000 per person and $10,000 per accident". (Brief for appellant at 6.) Thus, the trial court was correct in vacating the arbitrator's decision *in this case.*

The majority in its legal reasoning in this case relies upon the decisions of *White v. Concord Mutual Insurance Company and Commercial Union Insurance Company,* 296 Pa.Super. 171, 442 A.2d 713 (1982) and *Davis v. Government Employees Ins. Co.,* 296 Pa.Super. 198, 442 A.2d 727 (1982); (both filed February 1982). I include by reference the dissenting opinion of Justice Shertz who correctly concludes and analyzes the applicability of *National Grange Mut. Ins. Co. v. Kuhn,* 428 Pa. 179, 236 A.2d 758 (1968).

The majority in this case looks at a half glass of milk and concludes that it is half full. I conclude that the glass is

4. We have not overlooked the fact that the lower court said it was "vacating" the award rather than "modifying" or "correcting" it. Under the Act of 1927 a court's power to vacate an award is defined in terms different from its power to modify or correct an award. *Compare* § 10, 5 P.S. § 170, *with* § 11, 5 P.S. § 171. The power to enter the equivalent of judgment notwithstanding the verdict is provided as part of the power to modify or correct an award. Thus the lower court should have said it was modifying or correcting the award, instead of saying that it was vacating it.

half empty. The majority then concludes that half or partly full equals full. The legislature provided that no insurance policy shall issue *unless* it provides *coverage* for uninsured motorists. The majority concludes that *coverage* means *partial* or *incomplete coverage*; I conclude that coverage that is not provided to the extent of the minimum statutory amounts prescribed by the state legislature is uninsurance to the extent that coverage is lacking. A motorist, under the Act of August 14, 1963, P.L. 909, as thereafter amended, 40 P.S. 2000(a), is entitled to *minimum coverage* for injuries or death resulting from motor vehicular accidents. Surely the legislature did not intend to protect, with minimum coverage, only those who are injured by motorists who are over-insured (those who have coverage in excess of the minimum limits) or those who are totally uninsured. I submit that the majority's opinion judicially legislates these classes of motorists: (1) Those who are over-insured; (2) Those who are totally uninsured; and (3) Those who are inadequately insured.

The Uninsured Motorist's Statute must be examined. The primary issue dealt with in the above section, it appears to us, is that of *coverage* first. That is, the section first refers to required coverage either contained within the policy of insurance or supplemental to that policy. Thus, the policy itself may not meet the limits of required insured amounts in that that required amount may be met by some type of coverage "supplemental thereto"; the term "uninsured" is used later in the section and is not defined by the Statute itself, making it a secondary reference point in interpretation. That interpretation, as a whole, must conform to the public policy and purpose of the act which is:

> ... to establish at reasonable cost to the purchaser of insurance, a statewide system of prompt and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims. 40 P.S. 1009.102(b)

This basic policy is enunciated and elaborated upon in a well-stated, clear "findings and purposes" section as follows: Pa.Stat.Ann. tit. 40 § 1009.102 (Purdon Supp.1978–79).

12. Findings and purposes.

(a) Findings.—The General Assembly hereby finds and declares that:

(1) motor vehicles are the primary instrumentality for the transportation of individuals;

(2) the transportation of individuals by motor vehicle over Commonwealth highways and other highways significantly affects intrastate commerce, particularly in metropolitan areas;

(3) the maximum feasible restoration of all individuals injured and compensation of the economic losses of the survivors of all individuals killed in motor vehicle accidents on Commonwealth highways, in intrastate commerce, and in activity affecting intrastate commerce is essential to the humane and purposeful functioning of commerce;

(4) to avoid any undue burden on commerce during the intrastate transportation of individuals, it is necessary and proper to have a Statewide low-cost, comprehensive, and fair system of compensating and restoring motor vehicle accident victims and the survivors of deceased victims;

(5) exhaustive studies by the United States Department of Transportation, the Congress of the United States, and the General Assembly have determined that the present basic system of motor vehicle accident and insurance law, which makes compensation and restoration contingent upon:

(A) every victim first showing that someone else was at fault;

(B) every victim first showing that he was without fault; and

(C) the person at fault having sufficient liability insurance and other available financial resources to pay for all the loses,

is not such a low-cost, comprehensive, and fair system;

(6) careful studies, intensive hearings, and some State experiments have demonstrated that a basic system of motor vehicle accident and insurance law which:

(A) assures every victim payment of all his basic medical and rehabilitation costs, and recovery of a reasonable amount of work loss, replacement services and survivor's loss; and

(B) eliminates the need to determine fault except when a victim is very seriously injured,

is such a low-cost comprehensive, and fair system;

(7) adoption of the system described in paragraph (6) in place of the system described in paragraph (5) would remove an undue burden on commerce;

(8) throughout the Commonwealth there should be uniformity as to the essential elements of the system of motor vehicle accident and insurance law to avoid confusion, complexity, uncertainty, and chaos which would be engendered by a multiplicity of noncomplementary systems, but the need for a basic system does not require that the Commonwealth itself directly administer, operate, or direct the administration or operation of such system; and

(9) a Statewide low-cost, comprehensive, and fair system of compensating and restoring motor vehicle accident victims can save and restore the lives of countless victims by providing and paying the cost of services so that every victim has the opportunity to:

(A) receive prompt and comprehensive professional treatment; and

(B) be rehabilitated to the point where he can return as a useful member of society and a self-respecting and self-supporting citizen.

(10) It is necessary to afford required coverages for motor vehicles to economically disadvantaged individuals at rates not so great as to deny such individuals access to insurance which it is necessary for them to have in order to earn income and to be or remain gainfully employed.

As the majority in *White*, supra, contends, the term "uninsured" is a term of art in the insurance business. The Insurance Commissioner has chosen to define this term according to whether the automobile was covered to the minimum insurance coverage of Pennsylvania Law—not as

to whether the claimant recovered minimum damages. We cannot subscribe to that definition although *White,* supra, and the majority there does so. The history, purpose, and design of 40 P.S. 1009.101 et seq., illustrate that the two terms of "uninsured" and "underinsured" are equivalent, at least to the extent that the policy holder does not meet Pennsylvania's $15,000 minimum.

In *United Services Auto Ass'n Appeal,* 227 Pa.Super. 508, 323 A.2d 737 (1974) it was said that a regulation may be deemed invalid if it is "contrary to constitutional, legislative, or administrative mandate, or against public policy or unconscionable". A definition which the majority urges would most certainly be thus in that the purposes of limiting litigation, prompt settlement of claims and more predictable awards to claimants would be foreclosed to those who, properly or not, are underinsured.

The majority here maintains that the Commissioner has more expertise in this area and prefers that he define the term "uninsured" since the legislature has not. We do not agree. The majority would have us abdicate our judicial function by deferring our judicial function of interpretation to the Commissioner's definition and urge this deference even in view of that definition being directly contrary to the policy and purpose of the Act.

The entire Act was challenged constitutionally in *Singer v. Sheppard,* 464 Pa. 387, 346 A.2d 897 (1975) and the challenge was quashed. There the Supreme Court, in a four to three decision with six opinions filed, held that the Act's provisions did not violate the Pennsylvania Constitution, either by limiting the damages recoverable by auto accident victims or by denying certain victims recourse to the courts. Nor did the Act violate the equal protection clause of the federal constitution's Fourteenth Amendment in establishing classifications among accident victims. The majority reasoned that the loss of certain rights to some victims was outweighed in the balance by the general benefit to society, stating "the legislature has substituted, in the case of relatively minor accidents, the prompt and sure recovery of

economic loss for the delayed and uncertain awards of the courts." (citations ommitted), 41 U. of Pitt. Law Review 27, 35 (1979).

The Act has been challenged on substantive due process grounds but has been easily upheld under the basic constitutional proposition that the Fourteenth Amendment requires only a showing that the legislation is reasonable and bears a rational relation to a permissible legislative objective. The rational relation justification is based on the assumption that the legislature has attempted to correct social evils associated with the old tort system, including the burden of processing all automobile accident litigation in the courts, the allegedly high cost of insurance would have been reduced, the lack of uniform availability of insurance coverage to many automobile owners and operators, the "inequities which have been visited upon claimants" because of uncertain allocating of benefits; and the heavy cost and delay in successfully pursuing a tort claim. *Pinnick v. Cleary*, 360 Mass. 1, 271 N.E.2d 599 (1971). It is asserted that the Act's attempt at correcting these social evils in the old system is achieved by treating those affected equitably through an *exchange of rights* (i.e. speedy recovery on his claim in exchange for the right to sue in tort). A further challenge as to substantive due process involved the aspect of compulsory insurance. This consent is upheld by the reasoning that this compulsory insurance is a perfectly reasonable means to effectuate a fair allocation of costs for compensating accident victims among all motor vehicle owners and operators, thus satisfying the "rational relation" test. 48 Temple Law Quarterly 481, 483 (1975).

The power of the legislature to protect the health, safety, and welfare of citizens requires this conclusion.

Thus, although this court sitting en banc very recently rejected the proposition that "underinsured" equals "uninsured" in *Davis v. Government Employees Ins. Co.*, 296 Pa.Super. 198, 442 A.2d 727 (1982); see also, *White v. Concord Mutual Company and Commercial Union Insurance Company*, 296 Pa.Super. 171, 442 A.2d 713 (1982), we cannot

subscribe to this holding or the dicta in the majority opinion of the case at bar. As illustrated by the foregoing discussion, the legislature had a definite and worthy purpose in enunciating the Pennsylvania No-Fault Act and its policy. This purpose would be sorely strained if out-of-state drivers could venture onto our state's highways with substantially lower coverage than that required by Pennsylvania, injure a Pennsylvania citizen, and not afford that citizen the same recovery as he would be entitled to if injured by a Pennsylvania tortfeasor. This directly undermines the state's legislative power to protect the health, safety, and welfare of its citizens.

In view of this, we do not agree that underinsured does not equal uninsured. The two terms, *as to the amount the tortfeasor is underinsured,* must be held as synonomous so that the policy of the No-Fault Act can be given its full force, weight, and effect.

Accordingly, we would hold that, while affirming the trial court as to the peculiar facts of the case before us, we equate "underinsured" with "uninsured".